[*511] *THE ATTORNEY–GENERAL v. THE PRESIDENT, DIRECTORS AND COMPANY OF THE BANK OF COLUMBIA.

Whenever a bank becomes insolvent and unable to pay its debts, the act of April, 1825, (Sess. Laws of 1825, ch. 325, sec. 17,) makes it the duty of the attorney-general to apply to the Court of Chancery for an injunction against the officers of the corporation, to restrain them from exercising any of the corporate franchises, and for the appointment of a receiver to take charge of the property and effects of the institution, and to collect and distribute the same among its fair and honest creditors.[1]

An information, verified by the oath of the attorney-general, setting forth that the bank had stopped payment, that a large amount of its bills were notoriously in circulation, and that it was reputed to be insolvent; and accompanied by the further statement of the attorney-general, under oath, that he believed the bank was insolvent, is sufficient to authorize the court to grant an injunction and appoint a receiver, where there is no denial by the corporation of the facts stated in the information.

A party who cannot be presumed to have positive knowledge of a fact, may swear according to his information and belief; and if it be not denied by the adverse party, who can swear positively upon the subject, it will be deemed as admitted.

Upon proceedings against a bank, under the statute for insolvency, an officer of the corporation is not a proper person to be appointed the receiver.

Where the corporation appealed from the decision of the court both as to the appointment of a receiver and as to the principle adopted of excluding its officers from the appointment, the court would not, pending the appeal, appoint a receiver, as long as there was no ground to apprehend danger to the fund before a decision could be had on the appeal.

[1] 2 R. S. (4th ed.) 607, sec. 47; *Verplank* v. *The Mercantile Ins. Co. of New York*, 2 Paige, 438; *Bank of Com'rs* v. *Bank of Buffalo*, 6 Paige 498.

In this case the court on a previous day had granted an injunction against the Bank of Columbia, upon the application of the attorney-general, and had made an order for the appointment of a receiver to take charge of its property and effects, and had referred it to a master to receive nominations of suitable persons as receiver, and to report as to the competency of the persons named and the sufficiency of the sureties offered by them respectively. And now, on behalf of the attorney-general, a motion was made for the appointment of such receiver; which motion was resisted upon the ground that the bank had appealed to the Court of Errors from the decision of the Chancellor both as to the appointment of a receiver of the bank and as to the principle of the order, by *which he had excluded the officers of the institution from being nominated as such receiver.

*1829.*

The Attorney-General
v.
Bank of Columbia.

July 11th.

[*512]

A. *Van Vechten* for the bank:—An appeal having been brought to the Court of Errors, all further proceedings are stayed. No steps can be taken, unless some necessity involving the preservation of the rights of the parties require it. All interlocutory orders of this court which involve the merits of the cause may be appealed from. (*Buel* v. *Street*, 9 John. R. 443; *Beach* v. *Fulton Bank*, 2 Wend. 225.) An appeal in the first instance stays all proceedings, and if further proceedings become necessary, a special application for that purpose must be made; notice of which should be given, to give the appealing party an opportunity of being heard.

The present is a vital proceeding to the bank and its creditors. The court in case of an appeal never act except upon the urgency and necessity of the case, and in order to prevent injustice, as where the debt is in jeopardy; and then, the court offer an alternative to the party to bring the money into court or to give security. (*Messionier* v. *Kauman*, 3 John. Ch. R. 66.) This court cannot act except judicially upon facts proved. There is now before the

court nothing to authorize them to proceed. The discretion of this court to act is not a mere volition, but a sound and enlightened discretion; which is subordinate to the discretion of the Court of Errors. Nothing appears from the information of the attorney-general, to show that this is a case of urgent necessity. The attorney-general swears to the information from his belief. The only fact within his knowledge is that the bank has stopped payment. This is not conclusive as to its insolvency. The act only authorizes the attorney-general to proceed in case of the insolvency of the bank. On this fact there ought to be conclusive evidence, before the court proceeds. The affidavit of the attorney-general as to his belief, is not sufficient to authorize an injunction. If so, it cannot be sufficient to warrant the extraordinary proceedings of the appointment of a receiver. (*Attorney-General* v. *Bank of Niagara*, 1 Hopk. R. 354.) The act of April 21, 1825, secs. *6 and 17, recognizes the distinction between a temporary suspension of payment and an actual insolvency. The legislature did not intend that a mere non-payment of debts should be evidence of insolvency. Banks may be embarrassed; the public interest may require the suspension of specie payments. This was the case during the last war. It was not then deemed evidence of insolvency. No proceedings can be had under the 17th section of the act for a mere temporary suspension of payment; but only in cases of actual insolvency. Such a construction must be given to the statute as will render effectual all its provisions.

*J. Sudam*, contra:—This case is distinguishable from all the cases cited by the opposite counsel. In those cases evidence of the facts which required proceedings subsequent to the appeal, did not accompany the appeal as in this case. It was therefore necessary in those cases to give notice to the opposite party, to afford him an opportunity of being heard. In this case the information states the charge of insolvency specifically; and the bank have had an opportunity of an-

swering that charge. The insolvency intended by the act, is where a corporation is unable to pay its debts. The information upon this point is conclusive until contradicted. A suspension of payment is evidence of insolvency. No fact alleged in the information has been denied by the Bank of Columbia. The question is, shall the funds of the bank be secured for the benefit of the creditors? The appointment of a receiver is necessary for this purpose. It is in evidence that the bank is insolvent: would it then be proper to leave its property in the hands of the directors, under whose administration the bank has failed?

*A. L. Jordan* appeared for certain of the creditors and stockholders who had petitioned for the appointment of E. Williams, the president of the bank, as receiver. Mr. Jordan contended that the interest of the bill holders was made by the statute the paramount interest. Next to their interest was the interest of the stockholders. The policy of the act is to protect the creditors. This will be most effectually done by those who have an interest in the institution. If the failure *of a bank is not conclusive evidence of fraud, then its officers are not ineligible to the appointment of receiver. Until the case of the Franklin Bank, it was always the practice to refer it to the master not only to judge of the fitness of the person nominated as receiver, but to make the appointment. (*Creuze* v. *Bishop of London,* 2 Brown's Ch. C. 253; *Tharpe* v. *Tharpe,* 12 Ves. 317; *Thomas* v. *Dawkins,* 3 Brown's Ch. C. 509.) In *Jenkins* v. *Jenkins,* (1 Paige's R. 243,) it was referred to a master to appoint a receiver. (*Haggerty* v. *Pittman,* 1 Paige's R. 298.)

*J. S. Van Rensselaer,* advocated the appointment of William B. Ludlow as receiver.

*J. Sudam,* in reply, nominated on behalf of the attorney-general Rufus Reed. He contended that the interests of the bill-holders would be best consulted by the appoint-

1829.

The Attorney-General v. Bank of Columbia.

[*514]

ment of a person not interested in the bank. Such an ap-pointment would secure a fearless investigation of its affairs, which the public demanded.

THE CHANCELLOR:—By the act of April, 1825, (Sess. Laws of 1825, ch. 325, sec. 17,) it is made the duty of the attorney-general, whenever any incorporated bank is insolvent and unable to pay its debts, to apply to this court for an injunction, restraining the officers of the institution from exercising any of the privileges and franchises granted by their charter, and from collecting or receiving any debts, and from paying out or in any way transferring any of the moneys or effects of such company ; and to appoint a receiver of its property, moneys and effects, and to distribute the same among its fair and honest creditors. About the 20th of May last, this bank stopped payment. This was a matter of public notoriety. It was also notorious that a large amount of its bills were in circulation ; and the institution was reputed to be insolvent. It was therefore the imperative duty of the attorney-general to proceed in the manner directed by the statute.

On the 13th of June last, he filed the information in this case, setting forth the above facts, and also that the state was a large stockholder in the institution. The information was *verified by his oath, and that of the comptroller ; and they also stated their belief that the bank was insolvent and unable to pay its debts ; and thereupon an injunction was granted which still remains in full force. The attorney-general also caused a copy of the information and affidavits to be served on the officers of the bank, with a notice requiring them to show cause, if any they had, why a receiver should not be appointed. In the meantime similar information had been communicated to the court by the oath of certain creditors of the institution, who had applied and obtained injunctions in the city of New York. At the time assigned the parties appeared : but no cause was shown to induce the court to believe that the bank was

able to pay its debts ; and no information was given in re-
lation to its concerns, the probable amount of its debts, or
its means of payment.    The attorney-general had done all
that could be done by him in any case, to satisfy the court
that the bank was insolvent.    No person could swear posi-
tively as to the insolvency of the institution, except its offi-
cers, against whom the proceedings were instituted ; and
the statement of the above facts was all that could reasona-
bly be called for under this part of the statute.    A vio-
lation of several provisions of the act of incorporation
subjects the institution to similar proceedings.    In those
cases the particular violations of the charter complained of
can and ought to be stated.    These undoubtedly are the par-
ticular facts and circumstances, which by the statute are re-
quired to be stated in proceedings against the bank.    Where
a party cannot be presumed to have positive knowledge of
a fact, it is the constant practice of this, and of all other
courts, to permit him to swear to his information and be-
lief; and give the adverse party, who alone can swear
positively on the subject, an opportunity to deny it on
oath.    If he does not deny it, or furnish some explanation
to induce the court to think otherwise, the belief of the
other party is to be taken as the fact.    That the bank had
stopped payment was not of itself conclusive evidence of
its inability to pay its debts; but it was at least *prima
facie* evidence of such inability or insolvency.    And the
evidence to explain the transaction and rebut that presump-
tion should have been *furnished by the officers of the in-
stitution.    They could have shown the fact, if any thing
but the insolvency of the corporation had induced or com-
pelled them to adopt a measure which in its consequences
produced so much individual suffering and distress.    These
were the reasons which made it the duty of the court to
order a receiver to be appointed.    The fact of insolvency
being established, the court had no discretion on the subject.

 Another important question presented to the court at that
time was whether one of the officers of the insolvent institu-

<div style="margin">

1829.

The Attorney-
General
v.
Bank of Co-
lumbia.

[*516]

</div>

tion should be appointed to investigate and close its concerns. Under the circumstances I thought there could be no room to doubt the decision which ought to take place on that question. The officers of the institution had made no expose of their concerns to the public. When called upon to show cause why a receiver should not be appointed, they produced no account, nor gave any information to the court as to the amount of their debts or their means of payment. They did not even state when, or by what means, their capital of one hundred and sixty-nine thousand dollars had been lost; so as to enable the court to form an opinion whether it would be right or proper to entrust the interest of their numerous creditors to the care or management of one of their number. It was impossible to ascertain, without a long and tedious examination of some weeks, and perhaps months, whether it might not be the duty of the receiver to institute proceedings against every officer of the corporation, under some of the provisions of the statute of 1825. If the property of the institution had been assigned by them to pay favored creditors, in contemplation of insolvency, or after they had stopped payment, it would be the duty of the receiver to prosecute them for the purpose of obtaining the amount for the benefit of the creditors generally. If they were indebted to the institution, it might be necessary to enforce the collection of such demands by suit. And if there had been fraud or mismanagement on the part of the officers of the institution, by which they had made themselves personally liable to the creditors, it would be the duty of the receiver to investigate the subject, and expose the fraud if any existed. *These remarks are not intended to apply personally to any of the officers of this institution except so far as relates to indebtedness. It was admitted by the gentleman proposed as receiver that he was a debtor; but whether to a large or small amount the court was not informed. Although the Chancellor, from a knowledge of the character of the gentleman who had controlled the affairs of this institution, was satisfied no fraud had

[*517]

been committed, yet he still had a duty to perform as re-
garded the public.  Those creditors who had been stripped
of their property by the failure of the bank, had a right to
claim from the court the appointment of a receiver upon
whose impartial investigations they might rely, and who
could have no interest in opposition to theirs.  So far as
respected myself, I did not believe any thing improper had
been done in that institution for many years past, to pro-
duce this calamity.  I am induced to give credit to the sug-
gestion of the counsel, that the death-blow was given to the
institution long since, and that it has been sustained for
many years only by a pledge of the personal responsibility
of a majority of the directors.  I was aware, from the re-
port of certain proceedings made to the legislature in 1820,
that as early as 1813, the officers of the bank had found it
necessary to make provisions for a permanent loan of
$150,000, from another institution; and for which a ma-
jority of the directors gave their own personal bonds, from
year to year, as collateral security; and that the stipulated
time of 15 years, for the continuance of that loan, had re-
cently expired.  It was to that circumstance I attributed
the failure of the institution at this time, and not to any re-
cent mismanagement of its concerns by any of the direc-
tors.  The rule adopted in this case was the same which
was adopted in the case of the Franklin Bank.  I decided
that it would be improper to appoint one of the officers of
the institution receiver, and I referred it to a master for the
purpose of enabling every person interested in the institu-
tion to name such person for that purpose, as he might
think proper.  The rule of exclusion adopted, I considered
as based upon sound principles of public policy; and upon
what I considered *the spirit and intent of the act under          [*518]
which these proceedings were instituted.  If the law will
not entrust the concerns of an insolvent institution in the
hands of its directors jointly, as trustees for the creditors,
certainly the court ought not to entrust them to a part only
as receivers.  Public policy requires that the directors shall

The Attorney-General *v.* Bank of Columbia.

1829.

understand distinctly that if they so manage the concerns of the institution as to produce insolvency, the property and effects of the institution will be taken from them entirely; and be placed in the hands of those who will investigate their conduct fearlessly and impartially.

The corporation appealed from the decision, both as to the appointment of a receiver, and as to the right of its officers to have the appointment if one is to be made. This objection is now interposed to prevent any further proceedings in this matter pending that appeal. It is undoubtedly correct, as suggested by the counsel who made this objection, that ordinarily, in this court, an appeal suspends, in the first instance, all further proceedings on the decree or order complained of. It may be doubtful whether this is a case where an appeal from the order directing a receiver to be appointed would prevent the court from proceeding so far as to designate the person to be appointed, that he might be prepared to act when the Court of Errors had disposed of the appeal. And if there was in the mean time any danger to the fund, the court might, on a proper application, direct him to do every thing necessary to protect the interest of all concerned, pending the appeal. But in this case a principle is involved in one part of the decision, which makes it proper for this court to forbear naming a receiver until the court of *dernier* resort have determined whether the officers of a bank which has become insolvent under their management, are proper persons to investigate the manner in which they have discharged their trust, and to close up the concern. If the interest of stockholders was to be consulted primarily, it would be proper to give to those indebted to the bank, and in doubtful circumstances, sufficient time to buy up the bills from honest creditors, at a great discount, and thus restore the broken institution to a state of solvency. But in that *case the real creditors would lose the greatest part of their debts, although the stockholders in the end might save something on their stock. It is therefore necessary and proper, in every case

[*519]

of this kind, for the protection of the creditors, who have the first claim upon the property of the institution, to turn its effects into cash with the least delay which is consistent with their interest; so that a distribution may be made before their necessities or fears compel them to sacrifice their demands to speculators. As the Court of Errors will be in session very shortly, when this question can be disposed of, I do not think there will be such an injury resulting from the delay in this case as should induce the court to take any further steps in the matter until that time.

The attorney-general has furnished no evidence that the funds of the bank are unsafe in the hands of the present officers; and there is nothing before me to show that they have so far involved themselves in this concern as to make their own solvency depend upon that of the institution. I shall, therefore, suspend the appointment of a receiver until the meeting of the Court of Errors, unless some person interested in the institution brings the case again before me, upon a suggestion that something further is necessary to be done for the safety of the fund. If that should be the case, it may be necessary to proceed in the appointment, as no authority for that purpose can be given to the directors, pending this appeal.